Donna Osbourne TORRES, Plaintiff,

v.

RELIANCE STANDARD LIFE INSURANCE COMPANY; Matrix Absence Management, Inc.; and the Tektronix, Inc., Long Term Disability Plan, Defendants.

No. 07–CV–202–BR.

United States District Court, D. Oregon.

March 14, 2008.

Samuel T. Stanke, Portland, OR, for Plaintiff.

Samuel K. Anderson, Davis Rothwell Earle & Xochihua, PC, Portland, OR, Joshua Bachrach, Rawle & Henderson, LLP, Philadelphia, PA, for Defendants.

## OPINION AND ORDER

ANNA J. BROWN, District Judge.

This matter comes before the Court on Defendants' Motion for Summary Judgment (# 22) and Plaintiff's Cross–Motion for Summary Judgment (# 26). For the reasons that follow, the Court **GRANTS** Defendants' Motion for Summary Judgment and **DENIES** Plaintiff's Cross–Motion for Summary Judgment.

### BACKGROUND

Plaintiff Donna Osbourne Torres began working for Tektronix, Inc., on March 25, 1996, and worked there until October 31, 2003. As a benefit of her employment, Plaintiff was a participant in the Tektronix Long Term Disability (LTD) Plan. Defendant Reliance Standard Life Insurance Company is the insurer and "Claims Review Fiduciary" of the Plan. Defendant Matrix Absence Management, Inc., also administers the Plan.

## I. Plan Language

The Plan provides Defendants will pay a "Monthly Benefit" if an insured:

(1) is Totally Disabled as a result of a Sickness or Injury covered by this Policy;

(2) is under the regular care of a Physician;

(3) has completed the Elimination Period; and

(4) submits satisfactory proof of Total Disability to us.

Administrative Record (AR) 725. The Plan defines "Totally Disabled" to mean as a result of Injury or Sickness:

(1) during the Elimination Period and for the first 24 months for which a Monthly Benefit is payable, an Insured cannot perform the material duties of his/her regular occupation; ...

(2) after a Monthly Benefit has been paid for 24 months, an insured cannot perform the material duties of any occupation. Any occupation is one that the Insured's education, training or experience will reasonably allow.

AR 717.

## II. Factual Background

In 1999 or 2000, Plaintiff moved from the position of fourth-level engineer with Tektronix to a job as a web applications developer/systems analyst, which is a sedentary "desk job."

On March 21, 2004, Plaintiff filed a claim for LTD benefits under the Plan alleging she was unable to perform her job due to back pain. On June 1, 2004, Defendants approved Plaintiff's claim and found Plaintiff satisfied the Plan's definition of Total Disability for her occupation. Defendants informed Plaintiff that "[p]eriodic documentation of [her] disability status will be required for further benefit consideration. Objective documentation of [her] continuous disability must be provided by the physician who is treating [her] and [be] satisfactory to us." AR 303. Defendants further informed Plaintiff that the Plan "stipulates that in order to be eligible for Long Term Disability Benefits beyond 24 months [she] must be totally disabled from performing the material duties of Any Occupation ... [and she] will reach the 24th month on April 29, 2006." AR 304.

In November 2005, Defendants attempted to schedule an Independent Medical Examination (IME) for Plaintiff with Thomas J. Rosenbaum, M.D. Plaintiff, however, objected to Dr. Rosenbaum performing such an examination because he had examined her previously in relation to a worker's compensation claim and, according to Plaintiff, reported certain aspects of that examination incorrectly. Plaintiff, therefore, appeared for the examination with a tape recorder with the intention of recording it. Dr. Rosenbaum refused to allow the examination to be recorded, and the exam did not proceed. AR 1625–26.

On March 1, 2006, Defendants sent Plaintiff a letter reminding her that a different definition of "Totally Disabled" would apply for purposes of the Plan as of April 24, 2006. AR 1085. Defendants noted "[t]he medical documentation on file currently supports [Plaintiff's] disability [only] through June 30, 2006." Defendants, therefore, requested Plaintiff to provide updated medical information from her doctors "in order to evaluate [Plaintiff's] entitlement to benefits beyond June 30, 2006." AR 1085.

On June 5, 2006, and June 16, 2006, Defendants reiterated their request for Plaintiff to provide them with updated medical information and asked to receive that information by July 17, 2006. AR 477. Defendants did not receive updated

medical information from Plaintiff by July 17, 2006. On August 2, 2006, therefore, Defendants informed Plaintiff that they were suspending her ongoing benefit payments because the medical information in Defendants' file did not support them. AR 1013–16.

On August 28 and September 5, 2006, Plaintiff submitted updated medical records to support her claim for benefits. On September 8, 2006, Defendants sent Plaintiff a letter notifying her that Defendants were denying continued LTD benefits for Plaintiff from August 1, 2006, after reviewing her updated medical records. AR 941–43. Defendants noted their medical department determined that, "absent [Plaintiff's] current psychiatric contributions, and based on physical conditions only, [Plaintiff] would be able to perform work of a sedentary nature." AR 942. Plaintiff appealed the denial of her claim.

On January 19, 2007, Defendants informed Plaintiff by letter that they adhered to their original decision to deny her claim. Defendants relied on the medical records produced by Plaintiff; an independent medical review (IMR) conducted by Anne MacGuire, M.D.; a Residual Employability Analysis (REA) conducted by a vocational expert, Jody Barach; an IMR psychiatric evaluation by Kevin P. Hayes, M.D., M.B.A.; and information found on the Internet that suggested Plaintiff was actively involved in the Wine & Food Society of Clark County and running a web-design business out of her home.

In her IMR, Dr. MacGuire reviewed the medical records provided by Plaintiff and noted diagnoses of chronic pain syndrome, degenerative arthritis of the lumbar spine, mild degenerative arthritis of the cervical spine, and "bilateral knees with improving osteoporosis." AR 490. Dr. MacGuire found the electrical studies of Plaintiff's right median nerve "were so minimal that [she] would hesitate to even call it carpal tunnel syndrome." AR 490. Dr. MacGuire also observed "there is no evidence for a neuropathic process in any of the history and multiple physical exams. In my opinion this diagnosis [of fibromyalgia] is not warranted." AR 491. With respect to Plaintiff's prognosis, Dr. MacGuire noted

degenerative arthritis in the lumbar spine, knees and improving osteoporosis are all common chronic problems that most adults deal with.... Most adults over the age of 40 have changes consistent with mild to moderate degenerative arthritis of the lumbar spine and weight bearing joints. These are certainly not shockingly severe conditions.

AR 491. As for Plaintiff's prognosis for degenerative arthritis, Dr. MacGuire stated "it does not necessarily progress. Fitness, caution with lifting and activity are essential for maintenance and control of symptoms." AR 491. Dr. MacGuire further reported the prognoses for Plaintiff's osteoporosis and for her chronic pain management are "excellent," and any fibromyalgia is not a disabling condition. AR 491. Dr. MacGuire stated Plaintiff should not participate in repetitive bending, twisting, or lifting objects that weigh more than 35 pounds on a regular basis, but Plaintiff was not restricted as to sitting, standing, walking, driving, fine motor control, or hand activities. AR 491.

In his psychiatric chart review, Dr. Hayes relied on the medical records submitted by Plaintiff and opined the medical records do "not support the presence of any severe impairing psychiatric illness for any period of time since the date of loss." AR 539. Dr. Hayes noted there was

evidence of possible selective history given [by Plaintiff] to ... providers.... [For example, Plaintiff] denied any previous back injury to one provider but later reported a significant back injury

to another provider that had occurred in 1996. She seemed to have require [*sic*] rather concentrated and intensive treatment for that injury.

AR 539. Dr. Hayes reported

[t]he records suggest [Plaintiff] is very invested in establishing a temporal relationship between her back pain and the lifting of a monitor at work.... Some providers have indicated that there is evidence of psychological overlay, but this is a generic catchall which could be inclusive of symptoms of a somatoform condition, factitious disorder or even malingering.... Given the inconsistencies noted in the records, I cannot discern [Plaintiff] has had or currently has any severe psychiatric condition.... [T]here is considerable concern about the inconsistencies that are reflected in the claim and the differences in histories gathered by various providers.

AR 540.

For the REA, Barach reviewed the medical records submitted by Plaintiff as well as Plaintiff's job description and previous work experience and concluded Plaintiff "has transferable skills" pursuant to the United States Department of Labor Dictionary of Occupational Titles that would allow her to perform work as a programmer analyst, systems analyst, user-support analyst, desktop publisher, and/or network-control operator. AR 737–38.

In their January 19, 2007, letter, Defendants also relied on information gleaned from an Internet search that

resulted in [Defendants'] discovery that [Plaintiff] is quite active in the Food & Wine Society of Clark County.... [F]or example, [Plaintiff] ... was physically capable of coordinating and participating in a six-hour club outing on October 14, 2006, *and she apparently planned to do so in advance.*

AR 481 (emphasis in original). Defendants attached print-outs of Internet pages describing the October 14, 2006, outing and requesting members of the society to "RSVP to Donna Torres." AR 559. Defendants also attached the October 2006 newsletter of the Food & Wine Society of Clark County in which it was reported that Plaintiff attended a wine-sharing dinner on September 15, 2006. AR 616. The Food & Wine Society newsletter also informed members that Plaintiff and her husband would be hosting a Christmas party for the Society at their home on December 9, 2006, from "6:00 p.m.—? ? ?," which would include "food, music, wine, and lots of fun." AR 482. In a later newsletter, the Society thanked the Torreses for the Christmas party and reported it included "a vertical tasting of wines ... and a 'white elephant' gift exchange." AR 591.

Defendants also attached pages from the website of LDTorres.com that show the company designed several websites between 2004 and 2006. In addition, Defendants investigated LDTorres.com on the Internet via "who.is." AR 483. Who.is noted the domain name LDTorres.com was registered to Plaintiff's home address and listed Plaintiff as the administrative, technical, and billing contact for the company. AR 518. Defendants concluded they "must assume [Plaintiff] is currently engaging in her pre-disability occupation of Web Application Developer by operating a web design company from home" because they had not "received information from any *disinterested* party to the contrary." AR 483 (emphasis in original).

### III. Procedural Background

On February 12, 2007, Plaintiff filed a Complaint in this Court in which she alleged Defendants violated the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132(a)(1)(B), and defamed Plaintiff.

On May 22, 2007, Plaintiff filed a First Amended Complaint in which she alleges

Defendants violated ERISA when they denied her claim for LTD benefits.

On September 26, 2007, Defendants moved for summary judgment on the ground that Defendants did not abuse their discretion when they denied Plaintiff's claim for benefits under the Plan. On October 22, 2007, Plaintiff filed a Cross–Motion for Summary Judgment.

## STANDARD OF REVIEW

■ Although this matter is before the Court on cross-motions for summary judgment, the usual summary judgment standard under Federal Rule of Civil Procedure 56 is not applicable to ERISA actions. When reviewing a benefit plan's decision to deny benefits, "a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply." *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir.1999).

## I. Abuse of discretion vs. *de novo* review of ERISA plans generally.

■ When an ERISA plan provides the plan administrator with discretionary authority to determine eligibility for benefits, the district court ordinarily reviews the plan administrator's decision to grant or to deny benefits for an abuse of discretion. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989).

"Abuse of discretion review applies to a discretion-granting plan even if the administrator has a conflict of interest.... [T]hat conflict[, however,] must be weighed as a factor in determining whether there is an abuse of discretion." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 965 (9th Cir.2006)(quotation omitted). "A district court when faced with all the facts and circumstances, must decide in each case how much or how little to credit the plan administrator's reason for denying insurance coverage. An egregious conflict may weigh more heavily ... than a minor, technical conflict might." *Id.* at 968.

The level of skepticism with which a court views a conflicted administrator's decision may be low if a structural conflict of interest is unaccompanied, for example, by any evidence of malice, of self-dealing, or of a parsimonious claims-granting history. A court may weigh a conflict more heavily if, for example, the administrator provides inconsistent reasons for denial, fails adequately to investigate a claim or ask the plaintiff for necessary evidence, fails to credit a claimant's reliable evidence, or has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record.

*Id.* at 968–69 (citations omitted).

■ Plaintiff bears the burden to establish that she is disabled and, therefore, is entitled to benefits.

■ Generally the district court only reviews

the administrative record when considering whether the plan administrator abused its discretion, but may admit additional evidence on *de novo* review. That principle is consistent with *Tremain*, 196 F.3d at 976–79, which permits extrinsic evidence on the question of a conflict of interest. The district court may, in its discretion, consider evidence outside the administrative record to decide the nature, extent, and effect on the decision-making process of any conflict of interest; the decision on the merits, though, must rest on the administrative record once the conflict (if any) has been established, by extrinsic evidence or otherwise.

*Id.* at 970. "[P]rocedural irregularities in processing an ERISA claim do not usually justify *de novo* review." *Id.* at 972. "There are, however, some situations in which procedural irregularities are so substantial as to alter the standard of review" such as when a plan administrator "engages in wholesale and flagrant violations of the procedural requirements of ERISA, and thus acts in utter disregard of the underlying purpose of the plan." *Id.* at 971. In that instance, the Court must review de novo the administrator's decision to deny benefits. *Id.*

"When a plan administrator has failed to follow a procedural requirement of ERISA, the court may have to consider evidence outside the administrative record." *Id.* at 972–73.

> Even when procedural irregularities are smaller, ... and abuse of discretion review applies, the court may take additional evidence when the irregularities have prevented full development of the administrative record. In that way the court may, in essence, recreate what the administrative record would have been had the procedure been correct.

*Id.* at 973.

## II. Abuse-of-discretion standard of review applies in this matter.

■ The parties agree the policy in this case contains an explicit grant of discretionary authority to Reliance as Claims Review Fiduciary to interpret the policy and to make decisions about eligibility for benefits. Accordingly, the Court generally would review the denial of Plaintiff's benefits using the abuse-of-discretion standard. Nevertheless, Plaintiff contends the Court should review *de novo* Defendants' decision to deny Plaintiff benefits under the Plan because (1) Defendants are operating under an inherent or structural conflict of interest and (2) Defendants denied Plaintiff the opportunity to address the accura-

cy and reliability of the two IMRs, the REA, and the Internet print-outs on which Defendants based their final decision to terminate Plaintiff's benefits. Defendants, however, contend the Court should apply the abuse-of-discretion standard because Defendants provided consistent reasons "grounded on [a] reasonable basis" for denying Plaintiff's claims.

The Ninth Circuit has noted instances when the court should review *de novo* an administrator's decision to deny benefits because an administrator "engaged in wholesale and flagrant violations of the procedural requirements of ERISA, and thus act[ed] in utter disregard of the underlying purpose of the plan" are "rare." *Id.* at 971–72. The Ninth Circuit, however, also has noted *de novo* review is "not mandated" in the "more ordinary situation in which a plan administrator has exercised discretion, but in doing so, has made procedural errors." *Id.* at 972.

In *Abatie*, the Ninth Circuit pointed out that it had previously found a plan administrator committed wholesale and fragrant violations of the procedural requirements of ERISA when "the administrator had kept the policy details secret from the employees, offered them no claims procedure, and did not provide them in writing the relevant plan information." *Id.* at 971 (citing *Blau v. Del Monte Corp.*, 748 F.2d 1348 (9th Cir.1984)). The Ninth Circuit declined to review *de novo* the administrator's denial of the plaintiff's claim even though the court concluded the administrator "tack[ed] on a new reason for denying benefits in a final decision, thereby precluding the plan participant from responding to that rationale for denial at the administrative level" and violating ERISA procedures. *Abatie*, 458 F.3d at 974. The Ninth Circuit concluded "this procedural violation must be weighed by the district court in deciding whether [the defendant] abused its discretion." *Id.*

There is not any evidence here that Defendants kept the policy details secret from Plaintiff, failed to offer her a claims procedure, failed to provide her with the relevant plan information in writing, or committed similar procedural errors that rise to the level of "wholesale and flagrant violations of the procedural requirements of ERISA." The Court, therefore, concludes Defendants did not "act[] in utter disregard of the underlying purpose of the plan."

Accordingly, the Court reviews Defendants' denial of Plaintiff's claim for abuse of discretion.

### III. Level of Scrutiny

■■■ Although the Court has determined it will review Defendants' decision for abuse of discretion, the Court must now determine "the ... level of scrutiny with which to review the denial." *Peterson v. Fed. Express Corp. Long Term Disability Plan*, No. CV05–1622–PHX–NVW, 2007 WL 1624644, at *19 (D.Ariz. June 4, 2007)(citing *Abatie*, 458 F.3d at 965). When the administrator of a benefit plan also operates as the funding source, a conflict of interest is "inherent" and generally the court must give it some weight "even if [the conflict is] merely formal and unaccompanied by indicia of bad faith" because it creates an "incentive to pay as little in benefits as possible to plan participants." *Abatie*, 458 F.3d at 965–66. In addition, when determining the level of scrutiny to apply, courts also may consider factors such as evidence of malice, self-dealing, "a parsimonious claims-granting history," inconsistent reasons for denial, inadequate investigation into a claim, failure to credit a claimant's reliable evidence, a history of denying "benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record," and

procedural irregularities. *Id.* at 968, 972. As noted, Defendants here have a structural or inherent conflict of interest. The Court, therefore, must give that fact "some weight" when reviewing Defendants' decision to deny Plaintiff's claim for benefits.

Plaintiff contends the Court should review Defendants' decision with a high level of scrutiny because Defendants' decision contained procedural irregularities that prohibited Plaintiff from fully developing the administrative record; *i.e.*, Defendants relied for the first time on the IMRs, the REA, and information from the Internet when they made their final decision denying Plaintiff's claim. Defendants, on the other hand, contend their conduct does not warrant a high level of scrutiny by the Court. Defendants rely on *Silver v. Executive Car Leasing Long–Term Disability Plan*, 466 F.3d 727 (9th Cir.2006), to support their position.

In *Silver*, when the defendant benefit plan made its final decision denying the plaintiff's claim, it relied for the first time on a report by a vocational expert who based his opinion on the plaintiff's medical records. *Id.* at 732. The court concluded it was not procedural error for the defendant to do so. The court reasoned it would "lead to an interminable back-and-forth between the plan administrator and the claimant" if the defendant had to disclose the vocational expert report prior to its final decision because disclosure would prompt a response from the employee, which would, in turn, require more evaluation. *Id.* The court also noted the defendant satisfied ERISA's requirement of full and fair review with respect to the vocational expert's report because the plaintiff had "enough information to prepare adequately for ... an appeal to the federal courts" without disclosure of the report. *Id.*

■■■ Here, as in *Silver*, Defendants did not err when they failed to disclose the

two IMRs and REA before issuing a final decision because such disclosure would have led to the "interminable back-and-forth" cautioned against in *Silver*. In addition, the IMRs and the REA were based on records that Plaintiff submitted and that she had a full opportunity to explain. This Court, therefore, concludes these reports do not constitute procedural irregularities and, therefore, do not justify a heightened level of scrutiny.

██ Defendants' reliance on information gleaned from the Internet regarding Plaintiff's social activities, however, presents a different issue because Plaintiff could not anticipate Defendants' consideration of that information before Defendants' final denial of Plaintiff's claim. The Court, therefore, concludes Defendants' reliance on these new and unanticipated materials in its final decision constitutes a more significant procedural irregularity. Accordingly, the Court will apply a "moderate level" of scrutiny to Defendants' decision to deny Plaintiff's claim for benefits. *See, e.g., Peterson*, 2007 WL 1624644, at *20 (applying moderate level of scrutiny to the defendant benefit plan's decision to deny benefits when the court concluded the decision contained procedural irregularities).

## DISCUSSION

As noted, on January 19, 2007, Defendants denied Plaintiff's LTD claim on the ground that she did not establish she was unable to perform the material duties of *any* occupation. Defendants relied on the medical records provided by Plaintiff, the IMRs, the REA, and information obtained from the Internet.

## I. Evidence submitted by Plaintiff for the first time.

Plaintiff contends she should have a chance to rebut the new evidence Defendants relied on in their final denial of her claim; specifically, by introducing the Declarations of Plaintiff, her husband Lawrence Torres, and her son Travis Osbourne in which they address Defendants' assertions that Plaintiff was active in the Food & Wine Society of Clark County and was running a web-design business from her home. According to Defendants, however, the Court must review only the materials in the administrative record under the abuse-of-discretion standard. Thus, Plaintiff should not be allowed to submit evidence that was not before the administrator.

Defendants again rely on *Silver* in which the Ninth Circuit reiterated the restriction that a district court, when reviewing the denial of an ERISA claim, may only consider evidence that was in the record at the time of the administrator's decision. The court noted this restriction is "based on the principle that federal district courts should not function as substitute plan administrators, and ... expanding the record on appeal would frustrate the goal of prompt resolution of claims by the fiduciary." 466 F.3d at 731 n. 2. In *Silver*, the Ninth Circuit rejected the plaintiff's argument that "the district court improperly admitted documents prepared by [the defendant] in the course of the administrative appeal[,and, therefore, the defendant] unfairly kept the record open for itself after closing the record to [the plaintiff]." *Id.* at 732. The court reasoned the defendant "*had* to wait until [the plaintiff] had submitted all of his materials; for [the defendant] to do otherwise would either undermine [the plaintiff's] ability to present all of his supporting information or lead to an interminable back-and-forth between the plan administrator and the claimant." *Id.* (emphasis in original).

The Ninth Circuit reached a different conclusion, however, in *Saffon v. Wells*

*Fargo & Company Long Term Disability Plan*, 511 F.3d 1206 (9th Cir.2008). In *Saffon*, the Ninth Circuit held the district court erred when it refused to consider evidence presented by a beneficiary that was not before the administrator even though the Ninth Circuit determined the abuse-of-discretion standard applied. *Id.* at 1215. The Ninth Circuit offered the following "additional guidance" for the parties and the district court:

> [On remand] the district court must give [the plaintiff] an opportunity to present evidence on the one issue that was newly raised by [the defendant] in its denial letter—the results of a Functional Capacity Evaluation or other objective evidence of whether she is totally disabled under the terms of the Plan. [The plaintiff] need not present the results of such an evaluation, though she should be allowed to do so if she wishes. However, [the plaintiff] may, instead, offer evidence (from Dr. Kudrow or some other qualified expert) that such evidence is not available or not particularly useful in diagnosing her ability to return to her job.

*Id.* at 1215–16.

Similarly in *Neathery v. Chevron Texaco Corporation Group Accident Police No. OK826458*, the district court applied the abuse-of-discretion standard, reviewed the defendant benefit plan's decision to deny the plaintiff's claim, and concluded it could properly consider extrinsic evidence "when procedural irregularities during the administrative review affect administrative review by, for example, preventing a full development of the administrative record." No. 05 CV 1883 JM (CAB), 2007 WL 1110904, at *3 (S.D.Cal. Apr. 9, 2007)(citing *Abatie*, 458 F.3d at 973). The district court noted it also could review evidence that was not before the administrator "even when a defendant's decision is reviewed for abuse of discretion" so that the court could " 'recreate what the adminis-

trative record would have been had the procedure been correct.' " *Id.* (quoting *Abatie*, 458 F.3d at 973).

Here Defendants' reliance on the IMRs and the REA in making their final decision is similar to the conduct of the defendants in *Silver*. As noted, in *Silver* the Ninth Circuit concluded the defendant had to wait for the plaintiff to produce all of his supporting medical evidence before the defendant could develop the vocational expert's opinion on which it relied. If the plaintiff had been allowed to present further evidence in response to the vocational expert's opinion, the defendant would have had to issue a second opinion to address the additional evidence, which, in turn, would lead to "an interminable back-and-forth between the plan administrator and the claimant." *Silver*, 466 F.3d at 732. Here Defendants commissioned the IMRs and the REA based on all of the medical records that Plaintiff submitted to support her claim. Defendants had to wait until Plaintiff's supporting evidence was complete before conducting an IMR and REA. Accordingly, the Court concludes Defendants' reliance on the IMRs and REA when making their final decision was not a procedural irregularity that justifies the admission of additional extrinsic evidence by Plaintiff at this stage.

As noted, Defendants' reliance on information obtained from the Internet, however, is the kind of information that constitutes a different and new basis for denial that was not previously produced by Plaintiff or referenced by Defendants in their decisionmaking process. Because Plaintiff has not had an opportunity to respond to this new information, the Court will review and consider the Declarations of Plaintiff, Lawrence Torres, and Travis Osbourne as they bear on this "Internet information."

## II. Evaluation of the evidence.

 Applying the abuse-of-discretion standard of review, the issue before the Court is whether Defendants abused their discretion when they denied Plaintiff's disability claim. An administrator's decision is an abuse of discretion when it is " 'without reason, unsupported by substantial evidence or erroneous as a matter of law.' " *Riffey v. Hewlett–Packard Co. Disability Plan,* No. CIV. S–05–1331 FCD/JFM, 2007 WL 946200, at *14 (E.D.Cal. Mar. 27, 2007)(quoting *Abnathya v. Hoffmann–La Roche, Inc.,* 2 F.3d 40, 45 (3d Cir.1993)). If an administrator's decision has a rational basis, the court may not substitute its judgment for that of the administrator when determining eligibility for plan benefits even if the court disagrees with the administrator's decision. *Id.* Under the abuse-of-discretion standard, the court's inquiry "is not into whose interpretation of the evidence is most persuasive, but whether the plan administrator's interpretation is unreasonable." *Clark v. Wash. Teamsters Welfare Trust,* 8 F.3d 1429, 1432 (9th Cir.1993)(quotation omitted). Finally, "the focus of an abuse of discretion inquiry is the administrator's analysis of the administrative record—it is not an inquiry into the underlying facts." *Riffey,* 2007 WL 946200, at *14 (citing *Alford v. DCH Found. Group Long–Term Disability Plan,* 311 F.3d 955, 957 (9th Cir.2002)).

 Here Defendants had conflicting reports from some of Plaintiff's treating physicians and Defendants' reviewing physicians. "This is typical of the evidence used in disability determinations. Reasonable people can disagree on whether [Plaintiff] was disabled for purposes of the ERISA plan. Because that is so, the administrator cannot be characterized as acting arbitrarily in taking the view that [Plaintiff] was not." *Jordan v. Northrop Grumman & Welfare Benefit Plan,* 370 F.3d 869, 880 (9th Cir.2004). As in *Jordan,* Defendants had statements from Plaintiff's doctors that she was disabled and opinions from Defendants' doctors that Plaintiff was not entirely unable to work even though she may suffer from a degenerative disease. Although Plaintiff complained to numerous doctors about various issues including back and joint pain and fatigue, the record contains little objective evidence to support the level of pain that Plaintiff reported. For example, an MRI performed in March 2005 on Plaintiff's right knee showed "patella femoral marked osteoarthritis and medial compartment mild osteoarthritis." AR 836. An x-ray of Plaintiff's left knee at the same time showed "mild medial compartment joint space narrowing, minimal tibial spine spurring, [and] no joint effusion." AR 836. Susan Kranzpiller, M.D., one of Plaintiff's treating physicians, opined the "impression [from the MRI and x-rays] is mild degenerative disease." AR 836. Similarly, in February 2005, Patricia Mizutani, M.D., an examining physician, opined Plaintiff had "mild degenerative disease." AR 1164. In June 2005, Peter Bonifede, M.D., another one of Plaintiff's treating physicians, noted Plaintiff had limited range of motion and "flexion" in her back as well as 6 of 18 fibromyalgia tender points. AR 843. Nevertheless, Dr. Bonifede "strongly encouraged [Plaintiff] to become more active and do the exercises previously given to her for her back, and . . . indicated that her chronic back pain will become worse if she becomes less active." AR 843. On June 22, 2005, Keith Bernstein, M.D., interpreted an MRI of Plaintiff's back and neck and reported it showed "mild right foraminal narrowing [at the C2–3 level,] but this does not compress the nerve root." AR 1139. Dr. Bernstein further reported the MRI revealed at the C4–5 through C6–7 levels "a small disc bulge and osteophyte formation

present[, which] minimally narrows the canal at these levels [and] mild left C6–7, moderate right C5–6, mild left C5–6, mild right C4–5, and mild-to-moderate left C4–5 foraminal narrowing." AR 1139. On January 11, 2006, Robert S. Djergaian, M.D., one of Plaintiff's treating physicians, reviewed an MRI of Plaintiff's back and noted it showed "a small retrolisthesis at L4–5, but the central extrusion at that level seen in 2003 was no longer seen." AR 1354. Dr. Djergaian further noted an EMG and nerve conduction studies showed

> some borderline slowing of the right median nerve at the wrist consistent with mild carpal tunnel syndrome, but no slowing of the ulnar nerve at the right elbow or slowing of the left median nerve. There was no denervation seen in the multiple right lower extremity muscles sampled.... So there was no evidence of radiculopathy.

AR 1354. Dr. Djergaian reported it was "difficult to interpreter [*sic*] manual muscle testing in that [Plaintiff] appears uncomfortable. She is also not giving full resistance with dorsiflexion and eversion." AR 1355. Dr. Djergaian told Plaintiff that "she really needs to work on mobilization and activation ... [because] she has severe flexibility as well as weakness and conditioning problems." AR 1355. On January 27, 2006, Govind Singh, M.D., one of Plaintiff's treating physicians, noted he was concerned about Plaintiff's condition, but "need[ed] a diagnosis to guide further Rx." AR 1189.

As the Ninth Circuit explained in *Jordan*, because

> a person has a true medical diagnosis does not by itself establish disability. Medical treatises list medical conditions from amblyopia to zoolognia that do not necessarily prevent people from working. After a certain age, most people have pain, with or without palpation, in various parts of their body, and they often have other medical conditions. Sometimes their medical conditions are so severe that they cannot work; sometimes people are able to work despite their conditions; and sometimes people work to distract themselves from their conditions. Physicians have various criteria, some objective, some not, for evaluating how severe pain is and whether it is so severe as to be disabling. It is not for [the] court to decide [a claimant's conditions] should be treated by ERISA plan administrators as disabling in a particular case. That is a medical and administrative judgment committed to the discretion of the plan administrator based on a fair review of the evidence.

*Jordan*, 370 F.3d at 880.

Applying the abuse-of-discretion standard and a moderate level of scrutiny, the Court finds after a review of the record as a whole, including Plaintiff's supplemental materials, there is a reasonable basis for Defendants' conclusion that Plaintiff was not totally disabled within the meaning of that term as defined by the Plan. The Court, therefore, concludes Defendants did not abuse their discretion when they denied Plaintiff's request for LTD benefits.

Accordingly, the Court grants Defendants' Motion for Summary Judgment and denies Plaintiff's Cross–Motion for Summary Judgment.

### CONCLUSION

For these reasons, the Court **GRANTS** Defendants' Motion for Summary Judgment (# 22), **DENIES** Plaintiff's Cross–Motion for Summary Judgment (# 26), and **DISMISSES** this matter **with prejudice.**

IT IS SO ORDERED.